1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JEFFREY J. BIGGS,

11          Petitioner,                        No. CIV S-03-1439 FCD GGH P

12       vs.

13   GRAY DAVIS, et al.,

14          Respondent.                FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1985 conviction for first

19   degree murder.  After carefully considering the record, the court recommends that this claim be

20   denied.

21   II.  Issues and Summary

22          The petition raised two claims: 1) breach (or recision) of the plea agreement; 2)

23   Equal Protection violation.  On March 31, 2004, the court denied petitioner's Equal Protection

24   claim.  On December 6, 2004, an evidentiary hearing was held regarding petitioner's claim

25   alleging breach of the plea agreement.

26   /////

1   It is important to the adjudication here to emphasize the remaining issue at bar.

2   The issue is not drawn as one involving the voluntariness or intelligence of a plea, nor is it one

3   alleging ineffective assistance of counsel at the plea stage.[1]  The issue concerns only breach of a

4   plea agreement.  See Petition at Ground 2.  The alleged breach of the plea agreement claim

5   requires discussion of two theories – (1) petitioner is entitled to specific performance of the plea

6   agreement, and (2) if entered into by "mistake," i.e., plaintiff was misinformed about a fact

7   essential to the plea agreement, the plea agreement should be rescinded.  The first theory depends

8   upon a plea agreement, certain as to its terms, the breach of which would require enforcement in

9   plaintiff's favor.  Although a unilateral mistake of fact basic to formation of a contact may be

10  grounds for recision of the contract, Donovan v. RFL Corp., 26 Cal. 4th 261, 278, 109 Cal. Rptr.

11  2d 807, 821-822 (2001), petitioner's own misreadings of that agreement or mispredictions

12  concerning the ultimate application of that agreement under the law do not transform an

13  otherwise clear plea agreement into a breached agreement.  In other words, a unilateral mistake

14  of contract interpretation does not void a plea agreement (contract).  See  Hedging Concepts, Inc

15  v. First Alliance Mortgage Co., 41 Cal. App. 4th 1410, 1420-1422 (1996) [unilateral, subjective

16  misinterpretation of contract is not a "mistake" constituting grounds for rescission]; Lawrence v.

17  Shutt, 269 Cal. App. 2nd 749, 764-765, 75 Cal. Rptr. 533, 542 (1969).

18  III.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

19  The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

20  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

21  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

22  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

23  standards of review to be used by a federal habeas court in assessing a state court's adjudication

24  \\\\\

25

26  [1] Respondent briefs ineffective assistance as if it were an issue in the case.  The court has scrutinized the petition and does not recognize it as an issue, much less an exhausted issue.

1   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

2   (9th Cir. 1997).

3            In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

4   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

5   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

6   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

7   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

8   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

9   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

10  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

11           "Unreasonable application" of established law, on the other hand, applies to

12  mixed questions of law and fact, that is, the application of law to fact where there are no factually

13  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

14  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

15  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

16  deference is not blindly automatic, "the most important point is that an *unreasonable* application

17  of federal law is different from an incorrect application of law....[A] federal habeas court may not

18  issue the writ simply because that court concludes in its independent judgment that the relevant

19  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

20  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

21  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

22  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

23  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

24           The state courts need not have cited to federal authority, or even have indicated

25  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

26  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

1   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

2   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

3   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

4   established Supreme Court authority reviewed must be a pronouncement on constitutional

5   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

6   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

7           However, where the state courts have not addressed the constitutional issue in

8   dispute in any reasoned opinion, the federal court will independently review the record in

9   adjudication of that issue.  "Independent review of the record is not de novo review of the

10  constitutional issue, but rather, the only method by which we can determine whether a silent state

11  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

12  2003).

13          No state court held a hearing and found facts with respect to petitioner's claim

14  that his plea agreement was breached.  This federal court held an evidentiary hearing.  Therefore,

15  the ordinary rule that state factual findings are presumed correct and can only be overcome by

16  clear and convincing evidence, see Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004), does

17  not apply here.  Rather the court engages in de novo fact finding.  Killian v. Poole, 282 F.3d

18  1204, 1207 (9th Cir. 2002).

19  IV.  Discussion

20          Petitioner argues that he plead guilty pursuant to a plea agreement providing that

21  he would be released from prison after serving 12 ½ years.  Because petitioner was not released

22  after this time, he argues that his plea bargain was breached.

23          A.  Background

24          On July 17, 1984, the San Mateo County Municipal Court filed a complaint

25  charging petitioner with murder and alleging two special circumstances: the murder was

26  intentional and carried out for financial gain within the meaning of Cal. Penal Code §§

1  190.2(a)(1) and 190.2(b); and that the victim was a witness to a crime who was killed for the

2  purpose of preventing his testimony in a criminal proceeding within the meaning of Cal. Penal

3  Code § 190.2(a)(10).  Petitioner's Dec. 3, 2004, lodged exhibits, tab 2, pp. 4-5.

4                     On December 21, 1984, the Superior Court filed an information making the same

5  allegations against the petitioner, but for the witness special circumstance allegation.  Id., pp. 6-7.

6  On December 26, 2004, attorney John Balliet was appointed to represent petitioner.  Id., p. 8.

7                     On February 21, 1985, the parties reached a settlement.  Id., p. 62.  There was no

8  written plea agreement.  However, the minutes from the February 21, 1985, hearing summarized

9  the terms of the agreement:

10                     Both counsel agree the matter will be submitted to the Court on the Preliminary
                       transcript.
11                     Conditions of the submission are as follows:
                       1.  The special circumstance allegation under V2190.2(a)(1) PC will be stricken
12                     by the District Attorney.
                       2.  The defendant will cooperate in the continuing investigation of the Diaz matter
13                     and related matters.
                       3.  The defendant will be placed in maximum security today in the San Mateo
14                     County Jail.
                       4.  Deputy District Attorney Tom Stevens will use his best good faith efforts to
15                     find a suitable out of state prison, which will include conjugal visits.  Any prison
                       chosen will be with the approval of the defendant.

16

17  Id., p. 62.

18                     The transcript from the February 21, 1985, hearing also contains a recitation of

19  these terms.  Petitioner's December 3, 2004, lodged exhibits, tab 1, pp. 114-115.  At this hearing,

20  Judge Knight also accepted petitioner's plea:

21                     Court: Mr. Biggs, you have a right to a jury trial in this matter.  A jury would be
                       twelve people who would be selected at random to hear your case and decide
22                     unanimously whether you are guilty or innocent.  Do you understand?

23                     Petitioner: Yes.

24                     Court: What has been suggested is that your case be submitted to me based upon
                       the transcript from the preliminary hearing in this case.  I will inform you, sir, that
25                     if the case is submitted to me, having reviewed the transcript, that I will find you
                       guilty of the charge.  Do you understand that?

26

5

1        Petitioner: Yes, sir.

2        Court: That, basically, that if you submit the matter to the court on the transcript, you are giving up your right to trial by jury, and by giving up you are basically
3        entering a plea of guilty.  Do you understand that?

4        Petitioner: Yes, sir.

5        Court: Do you understand the punishment in this case is 25 years to life with the possibility of parole, without the special allegation?  Do you understand?
6        Petitioner: Yes, sir.

7        Court: Have any threats or promises been made to you to induce you to submit this matter to the Court based upon the preliminary hearing?
8

        Petitioner: Other than–
9

        Court: Other than what has been said.
10

        Petitioner: Other than that, no.
11

        Court: Do you understand that the time you serve in state prison would be
12        followed by four years on parole?

13        Petitioner: Yes, sir.

14        Court: You have discussed this matter thoroughly with your attorney?

15        Petitioner: Yes, sir.

16        Court: Any other can think of that I should cover with this defendant in regard to this submission?
17

        Prosecutor: As far as the parole period, your Honor, I believe it is at least five
18        years.

19        Court: Five years parole on this, and as far as the factual basis you will make that determination yourself.  I will determine the facts from the preliminary hearing.
20

21  Id., pp. 16-18

22        On April 26, 1985, Judge Knight heard petitioner's motion to reduce his

23  conviction from first to second degree murder.  Respondent's Evidentiary Hearing Exhibit 1.

24  During the hearing, Balliet made two references to petitioner's plea as having been to 25 years to

25  life.  Balliet argued that petitioner had less culpability than the other three men who were

26  convicted in connection with the murder.  Balliet stated,

1         In the Diaz case, which was before this court, Mr. Diaz at the end of March
2         entered a plea to first degree murder with a special circumstance being stricken
         and faces a penalty of 25 years to life, the same Jeffrey Biggs.

3  Id., pp. 2-3.

4         At the conclusion of the hearing, Balliet argued,

5         When you add what's happened to Diaz or probably what will happen to Diaz or
         Lowery, the fact that Kizer got immunity, I think it's grossly disproportionate for
         what Jeffrey Biggs did to send him to prison for twenty-five years to life.

6  Id., p. 25.

7         In denying petitioner's motion Judge Knight stated,

8         I think you have done a good job for your client in getting him what he got.  He is
         probably going to be out of prison in twelve to sixteen years.  The victim is never
9         going to be around again.  His mother's life is ruined.  The motion to reduce to
         second degree is denied.

10

11  Id., p. 28.

12         Judge Knight then went on to sentence petitioner to twenty-five years to life.  Id.,

13  p. 29.

14         On May 15, 1985, petitioner filed a notice of appeal.  Petitioner's December 3,

15  2004, notice of lodging, tab 2, p. 76.  On January 20, 1987, the California Court of Appeals

16  found that the plea colloquy failed to get a direct waiver from petitioner of his decision to waive

17  his right against self-incrimination.  Id., tab 3, pp. 19.  The state appellate court gave petitioner

18  the option of either to be retried or not.  Id., p. 22.

19         Petitioner was to appear in Superior Court in June and July of 1987.  Id., pp. 9-11.

20  Balliet, again representing petitioner, filed a motion to dismiss because of an alleged violation of

21  petitioner's speedy trial rights.  Id., pp. 5-8.  This motion was either denied or abandoned (the

22  record does not indicate) because on November 6, 1987, petitioner appeared before Judge Kemp

23  and plead no contest to the murder charge.  Respondent's Evidentiary Hearing Exhibit B.

24         Judge Kemp began by discussing the terms of petitioner's plea agreement:

25         Court: This is an add on to the calendar?  Gentlemen, I frankly don't understand
         what it says in the promises here.  I've got the first three words, and that's:
26         "special circumstances dismissed," but then it says something about "same

1    conditions regarding..."

2    Balliet: Placement.

3    Court: "As original submission on transcript and to be delivered forthwith to
     C.D.C."  I have no idea what that's about.

4

5    Prosecutor: The first and third are self-explanatory; that there would not be a
     referral to the probation department; that is, forthwith delivery to C.D.C.  The
     middle one is there was an agreement at the time this matter was submitted on a

6    transcript over two years ago as to housing with the Department of Corrections.  I
     have agreed with Mr. Biggs that that would be renewed on behalf of the People.

7    That pretty much in terms of the agreement as to where he will be housed in the
     Department of Corrections, that that will be renewed as a condition of his plea.

8
     Court: What is that agreement?
9
     Prosecutor: That he will continue to receive the preferred housing arrangement
10   from the Department of Corrections.  The reason this came about in the first place,
     without going into detail, was because of an agreement reached with Mr. Biggs as

11   to his participation in this case with other people, and I am ensuring that simply
     because he withdrew a plea for a period of two months–two to three months that

12   he doesn't lose that benefit.  I don't want him to lose that benefit simply because
     he chose to exercise that which the Court of Appeal allowed him to do.  So, I

13   think the court merely has to advise him that he has been promised that identical
     housing arrangement that was made with the Department of Corrections at the

14   time of the plea, the original submission on the transcript will be renewed, and I
     think that would suffice for the record, and I am being very cautious about this

15   one.  It came back once because of inadequate advice, and I think this complies
     with the law.

16

17   Id., pp. 2-4.

18           Judge Kemp then took petitioner's plea. She began by asking petitioner if he had

19   the read form entitled "waiver of rights."  Id., p. 4.  Petitioner's main concern at the hearing was

20   that he be returned to Deuel Vocational Institute in Tracy to serve his sentence.

21   Court: Have any promises been made to you, Mr. Biggs?

22   Petitioner: Not at all.

23   Court: Do you understand that I cannot guarantee sitting here today, that they're
     going to take you directly to Tracy.  I want to be sure that you understand that;

24   that you may in fact be at Vacaville for some brief period of time.  Ultimately you
     are going to go to Tracy, but I can't absolutely assure that you're not going to go

25   to Vacaville for some brief time.  I don't want this to come back to haunt all of us.
     Ultimately–and the commitment is going to read that you are going to be housed

26   at Tracy, but apparently the Department of Corrections may take you, however,

1      briefly to Vacaville.  Do you understand that?

2      Petitioner: Yes, I do.

3      Court: And having that in mind, do you want to go ahead and enter this plea?

4      Petitioner: Yes, I do.

5      Court: Any other promises been made to you to enter this plea of no contest?

6      Petitioner: No, there hasn't.

7      Court: To a violation of section 187 of the Penal Code, murder in the first degree
       on or about September 6, 1981, what is your plea?

8      Petitioner: Guilty.

9      Court: It's no contest.

10     Petitioner: No contest, yes.

11     Court: Is this your signature on this form?

12     Petitioner: Yes, it is.

13     *****

14     Court: Time is waived and there is no legal cause, Mr. Balliet?

15     Balliet: That is correct.

16
       Court: The court is going to sentence the defendant to 25 years to life in the
17     Department of Corrections.

18     Id., pp. 6-8.

19              B.  Evidentiary Hearing

20              Petitioner's mother testified that after petitioner plead guilty, Balliet called and

21     told her that petitioner had got 25 to life but that he would serve only about 12 ½ years of that

22     according to the plea bargain.  Evidentiary Hearing Transcript, p. 6.

23              Petitioner testified that had he gone to trial and been found guilty of first degree

24     murder with special circumstances, he faced a sentence of life without the possibility of parole.

25     Id., p. 18.  Petitioner testified that his understanding of the plea agreement was that he would

26     plead guilty to first degree murder without the special circumstances pursuant to a slow plea.  Id.,

1   p. 19.  He believed that he would be sentenced to 25 years, but get out in 12 ½ years if he

2   behaved himself in prison and worked.  Id., p. 19.  Petitioner testified that Balliet told him that he

3   would serve 12 ½ years of his 25 to life sentence.  Id., p. 31.  Petitioner testified that Balliet did

4   not tell him that his release was in the hands of the Parole Board.  Id., p. 32.

5           When Judge Knight stated that petitioner would serve 12 to 16 years, petitioner

6   believed that he would serve the high end of 16 only if he messed up.  Id., p. 34.  Petitioner

7   understood the "life" portion of his sentence to mean the maximum he would spend in prison if

8   he committed a lot of prison violence.  Id., p. 58.

9           Petitioner testified that when Judge Knight took his plea and asked him if any

10  promises had been made to him, the transcript from that hearing left out part of his statement.

11  Id., p. 60.  The transcript, as set forth above, states that petitioner responded, "Other than –"

12  At the evidentiary hearing, petitioner testified that he thought he would have said, "Other than

13  the 12 ½ years."  Id., p. 73.  Petitioner suggested that the transcript inadvertently omitted this

14  statement.  Id.

15          In support of the evidentiary hearing, on September 3, 2004, the parties filed the

16  declaration of the prosecutor in petitioner's case, Lawrence Stevens.  Mr. Stevens is now a Judge

17  in the California Court of Appeals, First Appellate District.  Judge Stevens states that he does not

18  recall whether he had any discussions with Balliet or petitioner regarding the meaning of the 25

19  year to life sentence.  Stevens decl., ¶ 5.  While Judge Stevens does not know what Judge Knight

20  meant when he said that petitioner would probably get out of prison in 12 to 15 years, Judge

21  Stevens states that this sentence was in the range of sentences he actually knew life inmates

22  served.  Id., ¶ 5.  His memory is that a typical sentence for someone in petitioner's situation was

23  more like 15 to 16 years rather than 12.  Id.

24          The parties stipulated as to what Balliet would have testified to.  See Stipulation

25  filed December 3, 2004.  Balliet would have testified as follows:

26  \\\\\

10

vi.  That the final offer from the prosecutor's office was that Mr. Biggs would plead guilty in exchange for:

(a) The special circumstance allegation would be stricken upon motion by the prosecutor;

(b) Mr Biggs would continue to cooperate in the investigation of other enumerated matters;

(c) Mr. Biggs would be placed immediately in maximum security confinement in the county jail;

(d) The prosecutor would use his best good faith effort to find a suitable out-of-state prison which allowed conjugal visits; and

(e) Any prison chosen would be with the approval of Mr. Biggs.

vii.  That no other promises were made to Mr. Biggs in return for his plea of guilty.

viii.  That it was Balliet's custom and practice at that time to describe the collateral consequences of the plea to a client in Mr. Biggs's situation.  Balliet's understanding of California sentencing law was that defendants sentenced to life terms would serve two-third of the twenty-five to life sentence before being eligible for parole and eligibility for parole did not guarantee release.  Mr. Balliet has no personal recollection of these discussions with Mr. Biggs.

ix.  That Balliet has no personal recollection of this discussion with Mr. Biggs, but based on his memory of his practice, Balliet would have informed Mr. Biggs that his release from prison was in the hands of the parole board.

x.   That when Judge Clarence Knight stated to [sic] during the April 26, 1985, plea hearing that Mr. Biggs would probably be out in twelve to sixteen years, Judge Knight was not reciting any part of the plea agreement, nor what Balliet believes he had explained to Biggs would be the consequence of Biggs's plea.

xi.  That Balliet believes Judge Knight was only stating his understanding of the sentencing law, not promising or informing Mr. Biggs that he would actually be out of prison in twelve to sixteen years.

xii.  That the prosecutor's office, did not convey any promise or indication to Mr. Biggs, or me, that Mr. Biggs would be released from prison at any specific time.

xiii.  That the prosecutor's office did not convey any promise or indication to Mr. Biggs, through Balliet, that Mr. Biggs would receive a specific percentage of good or work time credits toward his sentence.

The parties also stipulated to the testimony of attorney James Courshon.  See December 3, 2004, stipulation.  Courshon has practiced criminal defense in San Mateo County

1  since 1966 and was familiar with the plea and sentencing practices of the San Mateo County

2  Superior Courts during the years 1985-1987 as well as other times.

3          Courshon would have testified that in 1984 through 1987, an inmate in San Mateo

4  County sentenced to 25 years to life could serve as short a time as 12 ½ years of their sentence.

5  Courshon would have testified that a defense attorney in San Mateo County in 1984-1987 would

6  have acted reasonably in informing a defendant pleading guilty to murder and agreeing to a 25 to

7  life sentence that his term in prison could be as little as 12 ½ years if the defendant complied

8  with the terms of the prison system.

9          C.  Background Law

10          At the time petitioner entered his plea, he was entitled to earn day for day custody

11  credits.  In 1988, the California Court of Appeals held in In re Monigold, 205 Cal. App. 1224,

12  253 Cl. Rptr. 120 (1988) that inmates serving life sentences were eligible to earn only one-third

13  custody credits.

14          For prisoners serving indeterminate terms, such as petitioner, conduct credits

15  apply only to the setting of the minimum eligible parole term (MEPD), at which time the prisoner

16  is entitled to a parole suitability hearing.  In re Dayan, 231 Cal. App. 3d 184, 282 Cal. Rptr. 269

17  (1991).  A life prisoner is usually scheduled for a parole suitability hearing within the year

18  preceding the minimum eligible date.  Cal. Penal Code § 3041.  Conduct credits are not applied

19  by the Board of Prison Terms after it sets an actual release date, after initially finding a prisoner

20  suitable for parole.  213 Cal. App. 3d at 189, 282 Cal. Rptr. at 272.

21          D.  Analysis

22          After reviewing the record, the court finds that petitioner's plea agreement was

23  that he would be sentenced to 25 years to life, and not 12 ½ years.  While the plea agreement was

24  apparently not written down prior to petitioner's entry of plea on February 21, 1985, and

25  November 6, 1987, it is clear from the record that this sentence was understood by petitioner, the

26  court, Balliet and the prosecutor.

1        At the February 21, 1985, hearing Judge Knight told petitioner that his

2   punishment was 25 years to life.  The court is not persuaded by petitioner's testimony at the

3   evidentiary hearing that the transcript from the February 21, 1985, hearing inadvertently omitted

4   his statement to Judge Knight that he had been promised a 12 ½ year sentence.  Rather, the

5   transcript indicates that petitioner understood that he was being sentenced to 25 years to life.  "In

6   assessing the voluntariness of the plea, statements made by a criminal defendant

7   contemporaneously with his plea should be accorded great weight."  Blackledge v. Allison, 431

8   U.S. 63, 73-74, 97 S. Ct. 1621 (1977).

9        The court's finding regarding petitioner's understanding of his sentence is

10  supported by the fact that at the April 6, 1985, hearing to reduce his conviction, Balliet twice

11  stated that petitioner had been sentenced to 25 years to life.  These statements reflect the

12  understanding by the parties of the agreed upon sentence.  Judge Knight's comment that

13  petitioner would probably get out of prison in 12 to 16 years was clearly his prediction regarding

14  when petitioner would be paroled rather than a statement regarding petitioner's sentence.

15  Moreover, this statement was made after petitioner entered his plea where he indicated his

16  understanding that his sentence was 25 years to life.  At the November 6, 1987, hearing,

17  petitioner also told Judge Kemp that no promises had been made to him.  After Judge Kemp

18  sentenced him to 25 years to life, petitioner did not speak up.

19        Petitioner's testimony at the evidentiary hearing also indicates that he understood

20  that he was being sentenced to 25 years to life.  Petitioner's testimony that he believed he would

21  be released in 12 ½ years on the condition that he behave well in prison does not support a

22  finding that he believed that he was being sentenced to a determinate term of 12 ½ years.  Rather,

23  this testimony suggests that petitioner believed that he would be paroled in 12 ½ years if he

24  behaved himself.  Petitioner's errant prediction regarding when he might be paroled does not

25  undermine the finding that he understood that he agreed to and was being sentenced to 25 years

26  to life.

1    Thus, while petitioner is correct that plea agreements are measured by contractual

2  principles, Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003), contractual principles,

3  including the doctrine of unilateral mistake, and when such is sufficient to rescind a contract, and

4  when it is not, govern here.  Petitioner does not really suggest that he did not understand the

5  precise sentence to which he agreed – he does assert that he misapprehended the manner in which

6  the contract would be interpreted and applied according to California law.  The *prosecutor* never

7  made a 12 ½ year release part of the plea bargain.  The *prosecuto*r never promised that petitioner

8  would be released after a specified time.  The court never enunciated any terms which would

9  permit the finding that a 12 ½ year term was promised.  Thus, there is no agreement which could

10  be specifically enforced.   In order for specific enforcement, the court would have to insert this

11  new 12 ½ year provision into a record devoid of this fact, and then pretend that the prosecution

12  had agreed to it.  No provision of contract law would permit such.

13    Moreover, the doctrine of unilateral mistake, which would only permit recision of

14  the agreement, does not assist petitioner.  The fact that after the plea was entered petitioner

15  believed, and the judge for that matter announced during sentencing in which he denied a motion

16  to reduce the first degree murder conviction, predictions about the future decisions of the BPT, or

17  calculation of time credits, does not render the initial plea agreement subject to recision.

18  Hedging Concepts, supra.  The fact that the law regarding credits applicable to indeterminate

19  sentences was later clarified adverse to petitioner does not void the contract.[2]

20    Petitioner's position, that his subjective interpretation of how his plea agreement

21  would ultimately play out must be honored, would make plea agreements in indeterminate

22  sentencing cases impossible.  Every prisoner would assert that his or her own unspoken beliefs

23  about when the plea agreement called for the granting of parole are part and parcel of the plea

24  _____

25    [2] A different situation favoring recision might be presented in the case where a certain
term of years was made a part of the agreement, or stated as a basic assumption in forming the
agreement, and that assumption later proved wrong.  Here, in entering the plea agreement, no
26  such assumption was ever made known to the prosecution or the court.

14

1    agreement.  The prosecution would never know precisely what it had bargained for.  Petitioner's

2    position is all the more unmeritorious when one reviews the transcript and petitioner

3    affirmatively testified that no promises had been made other than what was said on the record.[3]

4              Finally, even if petitioner's mistaken beliefs about the application of his contract

5    could be viewed as a type of unilateral mistake subject to the Donovan analysis, the fact of the

6    matter is that the enforcement of the contract as written is not unconscionable – a requirement for

7    application of the unilateral mistake doctrine in cases where the party seeking enforcement of the

8    contract did not mislead the party seeking recision, or otherwise cause the alleged mistake.

9    Donovan, 26 Cal. 4th at 281, 291, 109 Cal. Rptr. 2d at 825, 826, 831.  Petitioner cannot prevail

10   on this point.  The trial judge, who found petitioner guilty on the basis of the preliminary

11   transcript (as agreed to in the plea agreement) focused on the same argument, and rejected it.

12             If there is any disproportionality, it's the fact that [the co-
                 defendants] were perhaps getting too little [death penalty or more
13             time in prison was warranted], not that your client was getting too
                 much... so I have no hesitancy in denying the motion to [reduce the
14             first degree murder conviction to second degree].

15   RT (April 26, 1985) at 25.

16   The doctrine of unilateral mistake is inapplicable.

17             Because it is clear that petitioner's sentence pursuant to his plea bargain was 25

18   years to life, and that petitioner understood this, the court finds no breach of the plea agreement.

19   Accordingly, the court need not reach the prejudice prong of the Strickland analysis.

20             After conducting a de novo review of the record, the court finds that petitioner's

21   claim alleging breach of his plea agreement is without merit.

22             Accordingly, IT IS HEREBY RECOMMENDED that petitioner's remaining

23   claim alleging breach of the plea agreement be denied and judgment be entered in favor of

24   respondent.

25   _____

26        [3] The undersigned rejects petitioner's testimony that he believes that the 12 ½ year "term"
     of the agreement was something he testified to and which was left out of the transcript.

15

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED: 9/25/06

                                                /s/ Gregory G. Hollows

10
                                                _____
                                                GREGORY G. HOLLOWS
11                                              UNITED STATES MAGISTRATE JUDGE
   ggh:kj - big1439.157
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26